RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0248p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

LUIS GOMEZ-ECHEVERRIA, individually and on behalf of similarly situated persons; HERVIL GOMEZ-ECHEVERRIA, individually and on behalf of similarly situated persons; DARWIN JOEL FUENTES PEREZ, individually; ARTEMIO CORONADO ESTEBAN, individually; LEONEL LOPEZ Y LOPEZ, individually,

*Plaintiffs-Appellees*,

*v*.

PURPOSE POINT HARVESTING, LLC; EMILTO MORENO GOMEZ; LUCILLE JEAN GOMEZ,

*Defendants-Appellants*.

No. 25-2080

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:22-cv-00314—Jane M. Beckering, District Judge.

Argued: June 3, 2026

Decided and Filed: August 28, 2026

Before: BATCHELDER, GRIFFIN, and MATHIS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Robert Anthony Alvarez, AVANTI LAW GROUP, PLLC, Wyoming, Michigan, for Appellants. Jessica Mugler, BOIES, SCHILLER & FLEXNER, LLP, Washington, D.C., for Appellees. **ON BRIEF:** Robert Anthony Alvarez, AVANTI LAW GROUP, PLLC, Wyoming, Michigan, for Appellants. Kenya K. Davis, BOIES, SCHILLER & FLEXNER, LLP, Washington, D.C., Teresa Hendricks, MIGRANT LEGAL AID, INC., Grand Rapids, Michigan, for Appellees.

---

**OPINION**

---

GRIFFIN, Circuit Judge.

Defendants, Purpose Point Harvesting, LLC and its owners, recruited Guatemalans for seasonal agricultural work in West Michigan. Plaintiffs, five Guatemalan citizens, worked a variety of crops from 2017 to 2019, but their employment was colored by defendants' alleged illegal conduct, which included defendants charging plaintiffs illegal recruitment fees, subjecting them to squalid living conditions, underpaying them, restricting their freedom, and threatening to deport them if they alerted anyone of their plight.

Plaintiffs sued defendants under the Trafficking Victims Protection Reauthorization Act, the Fair Labor Standards Act, and state law. Following a jury trial, a verdict was returned in favor of plaintiffs, awarding them compensatory and punitive damages but not non-economic damages. On appeal, defendants challenge the punitive damages award and several of the district court's rulings and contend that plaintiffs' claims are barred by the operative statute of limitations. Finally, defendants aver that these cumulative errors violated their right to due process. We disagree on all grounds and affirm.

I.

Under the H-2A visa program, employers may hire foreign nationals for seasonal agricultural jobs. The U.S. Department of Labor closely regulates the H-2A program and imposes strict requirements on employers. For example, employers are prohibited from charging potential H-2A workers recruitment fees as a condition of their employment. 20 C.F.R. § 655.135(j). Employers must also file a Form ETA-790, which operates as a legal contract between the H-2A worker and the employer. As part of this contract, the employer agrees to provide certain benefits meant to support the H-2A worker while he or she is employed in the United States.

Defendants Emilto (Milton) Moreno Gomez, Lucille Jean Gomez, and their company, Purpose Point Harvesting, LLC, relied on the H-2A program to employ seasonal farmworkers, whom they then contracted out to third-party farms in Oceana County and Newaygo County, Michigan.[1] The five plaintiffs here—Luis Gomez-Echeverria, Hervil Gomez-Echeverria, Darwin Joel Fuentes Perez, Artemio Coronado Esteban, and Leonel Lopez y Lopez—are Guatemalans who entered into H-2A contracts with defendants for the 2017, 2018, and 2019 growing seasons. Their contracts with defendants included the promise that defendants would provide plaintiffs with adequate housing, workers' compensation insurance, any required tools, supplies, or equipment, meals, and transportation, and that they would pay the higher of either minimum wage or prevailing wages, which can include piece-rate wages, i.e., payment by the bushel.

According to plaintiffs, defendants breached the agreement and violated the law in several respects. To begin, defendants charged an illegal recruitment fee of $2,500 each year they worked. This fee amounted to over one year's wage in Guatemala and forced plaintiffs to borrow money, take out loans at high interest rates, and sometimes pay defendants back over the course of their employment. Defendants also failed to compensate plaintiffs as they agreed. On many days, plaintiffs worked from 3 a.m. to as late as 10 p.m. Yet their paychecks never reflected these 19-hour days. And defendants destroyed records tracking daily hours and piece-rate production for the 2017 and 2018 harvest seasons, stymieing any challenge by plaintiffs.

Further, plaintiffs allege that defendants forced plaintiffs to live in squalid conditions, in small trailers, often sleeping on couches rather than in beds. In contravention of their contracts, plaintiffs also had to purchase their own equipment, including rain jackets, boots, and headlamps. And defendants required plaintiffs to buy their food at a store owned by Lucille's father. Defendants also failed to provide or delayed providing medical care. In one instance, Hervil hurt his thumb while picking asparagus. Despite the severe pain from the injury, Hervil did not receive adequate medical care for two weeks. By that time, his wound had become infected, and he required surgery.

[1] Because several individuals share surnames, we refer to each individual party by their first name.

In addition to not upholding their end of the bargain, defendants allegedly limited plaintiffs' freedom. Defendants regularly confiscated plaintiffs' personal documents, including their passports and social security cards that were issued under the H-2A program—even though federal law strictly prohibits this. *See* 18 U.S.C. § 1597. Moreover, when plaintiffs opened accounts at a local bank, Lucille, without plaintiffs' knowledge, set herself as an authorized user, giving her direct access to these accounts. And Lucille withdrew $2,500 from Luis's bank account without his authorization, purportedly to pay the recruitment fee. Milton further demanded that plaintiffs keep quiet and lie about their treatment, including to Department of Labor officials, medical staff, and other individuals. To enforce compliance, Milton repeatedly threatened to deport plaintiffs, "stain" their visas, or "black-list" them so they could not return to the United States. Milton also restricted their cellphone use and limited who could visit them. And whenever workers needed to go shopping, Milton would go with them.

At one point in 2018, Hervil had enough of these conditions and his treatment by defendants. He left without telling defendants because he feared that defendants would further retaliate against him and call the police. Indeed, in addition to reporting Hervil to the Department of Labor, as required by law, Milton took the additional step of posting on Facebook that Hervil was missing and being tracked down by authorities. And when Luis left the following year, Milton notified the police about a missing person, not the Department of Labor.

Based on the above, plaintiffs sued defendants under the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1589; the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201; the Michigan Workforce Opportunity Wage Act (MWOWA), Mich. Comp. Laws § 408.411; the Michigan Human Trafficking Victims Compensation Act (MHTVCA), Mich. Comp. Laws § 752.981; and state contract law.

Defendants asserted counterclaims for breach of contract, among others. They also contested plaintiffs' version of events. Milton claims that he never charged a recruitment fee and that he collected workers' passports only to keep them safe. He also asserts that workers were regularly taken to other stores, engaged in social events, and were not required to shop at his

father-in-law's store. Although he admitted making some record-keeping mistakes early on, he rejected any substantial wrongdoing.

During the proceedings, the district court denied, as relevant here, defendants' motion for dismissal based on forum non conveniens, which had argued that the case should be dismissed and litigated in Guatemala. The case proceeded to trial on all plaintiffs' claims and defendants' counterclaim for breach of contract. The eight-day trial began on May 28, 2025. Midway through, defendants moved for a mistrial due to plaintiffs' counsel's questioning of Luis about an ex-romantic partner who was present in the courtroom during trial. The district court denied the motion.

The jury found defendants liable on every count, except for the MHTVCA claim against Lucille, and rejected defendants' counterclaim. The district court entered judgment in favor of plaintiffs, awarding $105,000 in compensatory damages, plus prejudgment interest, $450,000 in punitive damages, as well as $803,352.50 in attorneys' fees and $101,281.20 in costs. Defendants moved for remittitur of the punitive damages award and a new trial, both of which the district court denied. Defendants timely appealed.

## II.

Defendants first argue that the jury's award of punitive damages violates due process. "[T]he Fifth Amendment's Due Process Clause 'prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor.'" *Kidis v. Reid*, 976 F.3d 708, 715 (6th Cir. 2020) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003)). We consider three "guideposts" when evaluating whether a punitive damages award offends due process: (1) the degree of reprehensibility of defendants' conduct; (2) the punitive award's ratio to the compensatory award; and (3) sanctions for comparable misconduct. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 576–84 (1996). We review the constitutionality of the jury's punitive award de novo. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436 (2001).

A.

Generally, "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. To determine the degree of reprehensibility, we consider whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell*, 538 U.S. at 419. Although physical harm often justifies greater punitive awards, "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can [also] warrant a substantial penalty." *Gore*, 517 U.S. at 576 (citation modified).

Here, the jury awarded plaintiffs economic compensatory damages only. By doing so, defendants argue that the jury made an "express factual finding that no compensable psychological, dignitary, or emotional harm occurred," which, according to defendants, is also supported by the trial record. Thus, defendants contend that the jury lacked any basis to award punitive damages.

Although the lack of non-economic damages cuts in favor of defendants on this guidepost, our court has never conditioned punitive damages on juries awarding non-economic damages. Instead, we have merely emphasized that there must be sufficient evidence of reprehensibility for an award of punitive damages to comport with due process. *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 535 (6th Cir. 2005); *see Gore*, 517 U.S. at 576. Such evidence is present here.

First, a TVPRA claim inherently carries with it a degree of reprehensibility. *See Ditullio v. Boehm*, 662 F.3d 1091, 1098 (9th Cir. 2011) ("Punitive damages are generally appropriate under the TVPA civil remedy provision because it creates a cause of action for tortious conduct that is ordinarily intentional and outrageous."). Defendants could be found liable only if they (1) knowingly provided or obtained labor, or (2) knowingly benefited financially or received

anything of value from participation in a venture with knowledge or reckless disregard that they were engaged in providing or obtaining labor, by either (a) force or threats of force, (b) serious harm or threats of serious harm, (c) abuse or threatened abuse of legal process, (d) or by a scheme, plan, or pattern intended to cause the person to believe that if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint. *See* 18 U.S.C. § 1589(a)–(b). Consequently, the jury had to conclude, at a minimum, that defendants recklessly disregarded that they were benefiting from a venture that obtained labor by a pattern intended to cause plaintiffs to believe they would suffer some physical or legal harm. This is reprehensible conduct. And a pattern means that defendants' "conduct involved repeated action," not "an isolated incident." *Campbell*, 538 U.S. at 419.

Second, consider the evidence presented at trial. The jury heard evidence that defendants charged illegal recruitment fees, restricted plaintiffs' movement, destroyed records, confiscated passports, limited visitors, and repeatedly threatened plaintiffs with deportation and other consequences if they spoke out about their mistreatment. All this supports the jury's conclusion that defendants' conduct was intentional and egregious. *Gore*, 517 U.S. at 576. And the jury also heard evidence of plaintiffs' squalid living conditions and defendants' refusal to provide adequate medical care, which evinced "reckless disregard of the health or safety" of plaintiffs. *Campbell*, 538 U.S. at 419.

Moreover, plaintiffs were undeniably vulnerable victims who feared reprisal and the loss of the opportunity to work in the United States. Plaintiffs come from an impoverished community in Guatemala with few job prospects. For example, Luis testified that in Guatemala he worked on a palm plantation and earned $7 a day. And Artemio testified that he can't read and "sort of can write." Plaintiffs also cannot speak English.

To be sure, "[t]hat a defendant engaged in tortious or other wrongful conduct" alone is not enough for punitive damages. *Kidis*, 976 F.3d at 715. But the jury heard ample evidence to warrant condemning defendants for their reprehensible conduct, so this guidepost supports upholding the punitive damages award.

B.

Next, we look to the "punitive damages award [and] its ratio to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580. "[E]xemplary damages must bear a 'reasonable relationship' to compensatory damages." *Id.* (citation omitted). But the Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula." *Id.* at 582. "Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Id.*

Defendants argue that the ratio here crosses the constitutional line. They contend that because each plaintiff's compensatory award is high, the amount of punitive damages for each plaintiff should be closer to a 1:1 ratio and there must be more evidence of egregious conduct than that present here to support a higher ratio. We again disagree.

The average ratio of 1:4.3 for the total amount of compensatory damages compared to the total amount of punitive damages—$105,000 to $450,000—is rather modest. Further, the individual ratio for each plaintiff is in the single digits, and "[s]ingle-digit multipliers are more likely to comport with due process." *Campbell*, 538 U.S. at 425. Only Hervil's ratio of 1:9.5 approaches double digits, but the evidence regarding his injuries and his need to flee from defendants supports this variance. And we have affirmed awards with much greater ratios. *See, e.g.*, *Argentine v. United Steelworkers of Am., AFL-CIO*, 287 F.3d 476, 488 (6th Cir. 2002) (affirming a 1:42.5 ratio); *Jeffries v. Wal-Mart Stores, Inc.*, 15 F. App'x 252, 266 (6th Cir. 2001) (affirming a 1:50 ratio). In short, the ratio of compensatory to punitive damages is modest and well within constitutionally permissible limits, so this guidepost also supports upholding the punitive damages award.

C.

Finally, we ask "whether the [defendant] had fair notice that conduct of the sort that occurred here might result in penalties, fines, or punitive damages" comparable to the amount awarded by the jury. *Romanski v. Detroit Ent., L.L.C.*, 428 F.3d 629, 648 (6th Cir. 2005).

To answer this question, we compare the punitive damages award to "the civil or criminal penalties that could be imposed for comparable misconduct." *Gore*, 517 U.S. at 583.

In the relevant context here, Department of Labor regulations impose potential civil penalties for violations of the H-2A program. 29 C.F.R. § 501.19. The maximum civil penalty for each willful violation of any work contract or federal requirement is $7,289, and $2,166 for each non-willful violation. *Id.* § 501.19(c)(1). And repeated failures by defendants to pay plaintiffs proper wages and provide adequate housing, among other things, could have incurred substantial penalties dwarfing the $450,000 punitive damages award here. *Id.* § 501.19(a). Further, upon a finding of liability under the TVPRA, the statute imposes criminal penalties up to 20 years in prison, 18 U.S.C. § 1589, and a $250,000 fine for individuals and a $500,000 fine for organizations, *id.* § 3571(b)(3), (c)(3).

These provisions provided defendants with fair notice. Each individual award of punitive damages is about $90,000, which is less than half the potential criminal liability of the individual defendants under the TVPRA and less than a fifth of Purpose Point's potential liability. And even the highest award, $125,000 to Hervil, is, respectively, exactly half or a quarter of the potential liability. At bottom, the fact that the total punitive damages award is substantially less than the potential criminal penalties for defendants under the TVPRA places defendants on "fair notice that conduct of the sort that occurred here might result in penalties, fines, or punitive damages" in the amount awarded here. *Romanski*, 428 F.3d at 648. Thus, we conclude this guidepost supports upholding the punitive damages award as well.

In sum, we hold that the award of punitive damages comports with due process.

III.

Next, defendants assert that the district court erred by denying defendants' motion for a mistrial, limiting defendants' witnesses at trial, denying defendants' motion to dismiss for forum non conveniens, and permitting time-barred claims to proceed. Finally, defendants argue that these errors cumulatively deprived defendants of a fair trial in violation of due process. We find no error.

A.

We review a district court's denial of a motion for a mistrial under the abuse-of-discretion standard. *United States v. Howard*, 621 F.3d 433, 458 (6th Cir. 2010). And under Federal Rule of Civil Procedure 59, a district court may grant a new trial "when a jury has reached a 'seriously erroneous result' as evidenced by . . . the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 405 (6th Cir. 2006) (quoting *Holmes v. City of Massillon*, 78 F.3d 1041, 1045–46 (6th Cir. 1996)), *abrogated on other grounds as recognized by A.K. ex rel. Kocher v. Durham Sch. Servs., L.P.*, 969 F.3d 625, 629–30 (6th Cir. 2020).

On the second day of trial, plaintiffs called Luis to the stand. Upon taking the stand, Luis was visibly agitated. Plaintiffs' counsel, seeing this agitation, asked in front of the jury if anyone in the audience was causing Luis distress. Luis responded that his ex-romantic partner, whom he shares two children with, was in the courtroom. He explained that he believed defendants brought her there to pressure him. The district court then held a sidebar with counsel and inquired as to why the ex-partner was present. Defense counsel explained that he did not know how she came to Michigan, but Milton had explained the night before that she would appear in court that day. Defense counsel agreed to see if the ex-partner would voluntarily leave, which she did. The examination then proceeded without any comment to the jury by the district court. The next day, defendants moved for a mistrial, arguing that this scene incurably prejudiced the jury. After further briefing, the district court concluded that it was not entirely clear why the ex-partner was present, so the district court denied the motion; but it struck Luis's testimony related to his ex-partner and instructed the jury to disregard it.

On appeal, defendants contend that a mistrial was warranted because the comments caused incurable prejudice and the district court's instruction was insufficient to cure this substantial prejudice. Therefore, defendants argue, they are entitled to a new trial.

District courts have "broad discretion" to "judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a . . . trial." *Illinois v. Somerville*, 410 U.S. 458, 462 (1973). The same goes for motions for new trials. *City of*

*Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980). Although Luis's comments were prejudicial towards defendants, viewing the totality of the circumstances and affording proper deference to the district court, we discern no abuse of discretion in the district court's denial of the motions for a mistrial and a new trial. *See id.*

First, we note that Luis's comments were isolated. They comprised only ten questions of the eight-day trial. Second, the district court issued a curative instruction to alleviate any prejudice. And "juries are presumed to follow [the court's] instructions," unless there is "overwhelming probability" to the contrary. *Richardson v. Marsh*, 481 U.S. 200, 208, 211 (1987). Third, the instruction specifically addressed the improper questioning, struck the testimony from the record, and directed the jury to disregard it entirely. Because this instruction was specific and unequivocal—not generic or waffling—we give it greater credence. *See United States v. Hall*, 979 F.3d 1107, 1120 (6th Cir. 2020). Finally, the amount of compensatory damages aligned with the evidence of lost wages presented at trial, and the punitive damages remain modest and appropriate. So nothing in the record suggests that defendants were incurably prejudiced by these ten questions. Consequently, we conclude that the district court did not abuse its discretion and no new trial was warranted.

B.

We review the district court's decision to exclude evidence for an abuse of discretion. *United States v. Hruby*, 19 F.4th 963, 966 (6th Cir. 2021). "With respect to evidentiary questions in general and [Federal] Rule [of Evidence] 403 in particular, a district court virtually always is in the better position to assess the admissibility of the evidence in the context of the particular case before it." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008).

At trial, defendants sought to present testimony from current and former Purpose Point H-2A workers—who were in the same program but never interacted with plaintiffs—to rebut plaintiffs' allegations of mistreatment.[2] But the district court concluded that witnesses without

[2] Defendants assert that the district court's exclusion of these witnesses violated defendants' "constitutional right to present a complete defense." In support of this constitutional claim, defendants cite only criminal cases, which are inapposite to the civil context. To the extent that defendants assert the evidentiary rulings violated due process, we find it perfunctory and therefore forfeit. *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997).

personal knowledge of plaintiffs or defendants' treatment of them would be irrelevant under Rule 401, and substantially more prejudicial than probative under Rule 403. As a result, defendants were left with five witnesses who worked alongside plaintiffs, instead of their proposed 80. Defendants aver that this was an abuse of discretion.

The standard for relevancy is "extremely liberal," but it still sets a bar. *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009). Defendants admit that the workers they sought to call had no direct or indirect knowledge of defendants' treatment of plaintiffs. So by their own admission, these witnesses were not relevant, given that they could say nothing of consequence to the determination of the action. *See* Fed. R. Evid. 401(b). Even assuming testimony from defendants' proffered witnesses held some probative value, that value was minimal and would have easily been outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time. *See* Fed. R. Evid. 403. Accordingly, the district court did not abuse its discretion in excluding these witnesses.

C.

Defendants next assert that Leonel's, Darwin's, and Artemio's FLSA claims and Hervil's FLSA, MWOWA, and MHTVCA claims were time-barred. At the outset, this argument runs into several problems. Leonel, Darwin, and Artemio never brought FLSA claims—only Luis did, and defendants do not challenge his claim. Hervil, moreover, never brought an FLSA or MWOWA claim—he only brought a MHTVCA claim. And as to Hervil's MHTVCA claim, defendants waived any objection to it.

"Federal law governs whether a defense has been waived in federal court, but state law governs which defenses must be pleaded affirmatively to avoid waiver." *Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 680 (6th Cir. 2018). In Michigan, "a defendant waives a statute of limitations defense by failing to raise it in his first responsive pleading." *Walters v. Nadell*, 751 N.W.2d 431, 438 (Mich. 2008) (per curiam). Defendants never raised a statute of limitations as a defense to Hervil's MHTVCA claim in their first responsive pleading, or any pleading for that matter. Thus, the defense is waived, and we do not review it. *Exp.-Imp. Bank of U.S. v. Advanced Polymer Scis., Inc.*, 604 F.3d 242, 248 (6th Cir. 2010).

D.

Defendants also argue that this case should have been litigated in Guatemala and therefore appeal the district court's denial of their motion to dismiss for forum non conveniens. Under the doctrine of forum non conveniens, "a federal trial court may decline to exercise its jurisdiction, even though the court has jurisdiction and venue, when it appears that the convenience of the parties and the court and the interests of justice indicate that the action should be tried in another forum." *Associação Brasileira de Medicina de Grupo v. Stryker Corp.*, 891 F.3d 615, 618 (6th Cir. 2018). "After the court determines the degree of deference owed the plaintiff's forum choice, the defendant carries the burden of establishing an adequate alternative forum and showing that the plaintiff's chosen forum is unnecessarily burdensome based on public and private interests." *Hefferan v. Ethicon Endo-Surgery Inc.*, 828 F.3d 488, 492 (6th Cir. 2016). We review for an abuse of discretion. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981).

First, we agree that plaintiffs' choice of bringing this action in the Western District of Michigan warranted deference. The case centered around defendants' exploitation, coercion, threats, and failures to abide by the work contracts, among other things—all of which occurred in Michigan. The proximity to witnesses, evidence, and the assurance of personal jurisdiction offer "'a legitimate reason' to sue in Michigan." *Associação Brasileira de Medicina*, 891 F.3d at 619 (quoting *Hefferan*, 828 F.3d at 494).

Next, defendants bear the burden of identifying an adequate alternative forum. *Id.* at 620. They attempted to do so with the raw assertion that "the Guatemalan Civil Code provides for remedies for breach of contract, the Labor Code provides for remedies related to violations of minimum wage laws, and Guatemala allows for a claim of human trafficking." But unsupported, conclusory statements do not demonstrate that Guatemala was an adequate alternative forum. *Cf. id.* at 621–22 ("Without guidance from Brazilian legal experts or even citations to Brazilian law or treatises, we do not know whether Brazil's personal and subject-matter jurisdiction requirements could be satisfied on the facts alleged here.").

And "[b]ecause identifying an available and adequate alternative forum is a necessary prerequisite for *forum non conveniens* dismissal, we need not address . . . the balance of the public and private interest factors." *Id.* at 622. We therefore conclude that the district court did not abuse its discretion in denying defendants' forum non conveniens motion.

E.

Finally, under the cumulative-error doctrine, we consider whether the combined effect of multiple otherwise harmless trial errors renders a trial fundamentally unfair to amount to a deprivation of due process. *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004); *see also Beck v. Haik*, 377 F.3d 624, 644 (6th Cir. 2004) (extending cumulative-error doctrine to civil cases). But because we discern no errors, we likewise reject defendants' due process challenge.

IV.

We affirm.